NOT DESIGNATED FOR PUBLICATION

No. 119,694

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of P.W. and C.W.,
Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN M. SMITH, judge. Opinion filed February 1, 2019.
Affirmed.

*Jordan E. Kieffer*, of Dugan & Giroux Law, Inc., of Wichita, for appellant natural father.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GARDNER, P.J., ATCHESON and SCHROEDER, JJ.

PER CURIAM: Father appeals the district court's termination of his parental rights of P.W., a minor child born in 2010, and C.W., a minor child born in 2013. The district court found that Father was unfit, that his conduct was unlikely to change in the foreseeable future, and that termination of his parental rights was in the best interests of P.W. and C.W. Father disputes each of these findings. Finding no error, we affirm. We note that Mother's parental rights were also terminated but she filed a separate appeal which we have already decided.

*Factual Background*

In September 2016, the State filed a child in need of care (CINC) petition because P.W. was not attending school. The State amended that petition two months later and also

1

filed an additional petition regarding C.W. The district court granted temporary custody of the children to the Department for Children and Families (DCF) based on allegations of truancy, physical abuse, domestic violence, and substance abuse.

At a review hearing in December 2016, Mother and Father were required to submit to urinalysis (UA) testing. Both parents tested positive for methamphetamine and marijuana. As a result, Mother and Father were ordered to obtain drug and alcohol assessments.

The district court adjudicated the children as CINC on January 11, 2017. At the hearing, both parents entered a statement of no contest to the allegations against them and waived their right to an evidentiary hearing. The district court found that despite reasonable efforts to facilitate a permanency plan, the parents continued to test positive for marijuana. The court then ordered the children to remain in DCF custody and ordered a change of venue to Sedgwick County because the parents had moved there.

At a permanency hearing in March 2017, the district court ordered both parents to submit to a hair follicle test within 24 hours. But neither parent submitted to the test until almost two months later, when both tested positive for amphetamine and methamphetamine. Over the next few months, both parents continued to test positive for drugs and refused to submit to several UA and hair follicle tests.

In October 2017, the State filed a motion to terminate both parents' parental rights. At the termination hearing in January 2018, the district court heard testimony from Mother, Father, J.G. (the children's aunt), and Christina Somers (a licensed permanency specialist). The State also submitted 23 exhibits showing the parents' achievement plans, their substance abuse problems, and their refusal to admit drug use.

Mother testified about her living conditions, sobriety, and relationship with Father. As relevant here, Mother testified that she had previously expressed fear of being in her home due to arguments with Father but she refused to say that Father had hit her. The friend to which Mother had expressed these fears had taken Mother to a domestic violence shelter in October 2016.

Father testified that he was married to and living with Mother throughout the entirety of this case. Father explained that he and Mother were working through their reintegration plan as a couple. With regard to the reintegration tasks, Father admitted he had completed only what Mother had completed and did not complete those tasks any more quickly than Mother. He also admitted to having used methamphetamine before and after the children were taken from his custody. Father testified that the restaurant he and Mother worked at was filled with workers who smoked methamphetamine together while on shift. Father testified that after taking substance abuse treatment and testing positive for drugs, Somers asked him to reenter substance abuse treatment but he did not follow that recommendation. When asked whether methamphetamine users should be able to raise children, Father testified the he was not sure and that "chemicals are different in everybody." Father acknowledged, however, that he "probably" would not want someone who was using meth to be around his children and that "doing drugs and trying to be a parent" did not work well for him.

Father testified regarding the domestic abuse allegations against him. Father testified that his neighbors had called police to his residence on four different occasions. Father denied that the calls were made because he was fighting with his wife and instead insisted that his neighbors were acting vindictively in calling the police. Father was also questioned about an incident in which Mother destroyed his cell phone. Mother claimed that destroying the cell phone was an accident—she had inadvertently destroyed the phone while moving furniture. Father also claimed that the event was accidental and that he disagreed with the State's decision to prosecute Mother for the incident. But the

district court found that Mother and Father's testimony regarding these domestic violence issues was not credible.

Father testified that he and Mother were taking part in a parenting class and had completed the course. Father also testified that he and Mother were attending family counseling with a therapist, but Father failed to provide DCF with proof of the classes and therapy sessions. Father also admitted that he had not yet acknowledged his drug use issues with the therapist and had recently failed a hair follicle test.

J.G., the children's aunt, testified that she had been raising the children in her home since June 10, 2017. Although there was an adjustment period, J.G. testified that both children were doing well in her care. Both were also doing well in school and P.W. was in therapy. While the children were in J.G.'s care, Mother and Father were ordered to contact their children only over the phone and at the children's request. Before that court order went into effect, J.G. recalled one or two in-person visits that Mother had with C.W. but that P.W. had refused to attend. After the order went into effect, the children had no visitation with their parents and requested only one phone call with them on Christmas. That Christmas phone call was, however, cut short when the parents made several false promises which caused P.W. distress. J.G. testified that almost any interaction with the parents consistently caused P.W. sadness and frustration.

Somers, a permanency specialist, testified that the CINC proceedings began based on truancy concerns for P.W. and then the case progressed with concerns of substance abuse, homelessness, and physical abuse between the parents. P.W. had alleged that Mother and Father had used "gray tape" on her and C.W. and had physically abused them, but that claim was never substantiated. In April 2017, Somers met with both parents, discussed their achievement plan in detail, and gave the couple a copy of the plan. She told the parents they needed to complete a couple of court orders, including a

4

drug assessment and drug testing, but the parents refused to sign the plan and failed to follow the court orders.

Somers' gravest concerns included P.W.'s refusal to visit with the parents and the parents' drug use. According to Somers, Mother and Father eventually submitted hair follicle tests and tested positive for methamphetamine and amphetamines, and both parents continued to test positive for methamphetamine and marijuana in the following months. Mother and Father were requested to complete UAs 10 times but they completed them only twice. Somers testified that Mother and Father's use of drugs also inhibited DCF's ability to check their home for living suitability. She explained that St. Francis has a policy to ensure worker safety which requires parents to have a negative hair follicle test before DCF workers check their home.

After considering changing circumstances, Somers organized three different achievement plans for the parents. The plans were also amended because Mother and Father were failing to complete almost any of the plan tasks. Eventually both Mother and Father completed some tasks, including the following: getting a SACK assessment, gaining employment, showing proof of a lease agreement, getting water and gas turned on, and completing clinicals. But Mother and Father failed UAs even after treatment. Both were asked to reenter substance abuse treatment but refused. Mother and Father also failed to take parenting and anger management classes as required.

As of November 2017, the plan for P.W. and C.W. was changed from reintegration to adoption. Somers agreed with this change because Mother and Father continued to abuse drugs and made little progress toward reintegration. Somers worried that C.W. no longer had a parent-child relationship with Mother and Father. C.W. had concocted a story that Mother had died in a tornado and had started calling the parents by their first names instead of mom and dad.

5

Somers concluded that she did not think the children were safe in Mother and Father's care and that she did not see the parents changing in the foreseeable future. Somers thought it would be in the children's best interests to terminate both parents' parental rights.

After considering the evidence, the district court found both parents unfit by reason of conduct or condition which rendered them unable to properly care for their children and the conduct or condition was unlikely to change in the foreseeable future. The district court also considered the physical, mental, and emotional health of the children, contemplated the foreseeable future viewed through "child time," and determined that termination of parental rights was in the best interests of the children. Father timely appeals.

*Governing Legal Principles*

We begin with some general principles governing proceedings under the Revised Kansas Code for Care of Children, K.S.A. 2017 Supp. 38-2201 et seq. A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 759-60, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the inherent importance and unique character of that relationship, the right has been deemed fundamental. Accordingly, the State may extinguish the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2017 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

As provided in K.S.A. 2017 Supp. 38-2269(a), the State must prove the parent to be unfit "by reason of conduct or condition" making him or her "unable to care properly for a child" and that the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in

6

combination would amount to unfitness. K.S.A. 2017 Supp. 38-2269(b). And the statute lists four other factors to be considered if a parent no longer has physical custody of a child. K.S.A. 2017 Supp. 38-2269(c). In addition, the State may rely on one or more of 13 statutory presumptions of unfitness outlined in K.S.A. 2017 Supp. 38-2271.

In reviewing a district court's determination of unfitness, an appellate court must be convinced, based on the full evidentiary record considered in a light favoring the State as the prevailing party, that a rational fact-finder could have found that decision "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705. The appellate court cannot weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. In short, any conflicts in evidence must be resolved to the State's benefit.

Having found unfitness, the district court must then determine whether termination of parental rights is "in the best interests of the child." K.S.A. 2017 Supp. 38-2269(g). The district court makes that determination based on a preponderance of the evidence. *In re R.S.*, 50 Kan. App. 2d at 1116. The best-interests issue is essentially entrusted to the district court acting within its sound judicial discretion. 50 Kan. App. 2d at 1115-16. An appellate court reviews those sorts of decisions for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

7

*Clear and convincing evidence supports the district court's decision to terminate Father's parental rights*

Father contends that the district court's finding that he was unfit and that his unfitness was unlikely to change in the foreseeable future was not supported by sufficient evidence.

The district court found five statutory factors had established Father's unfitness:

K.S.A. 2017 Supp. 38-2269(b)(3)—"the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child."

K.S.A. 2017 Supp. 38-2269(b)(7)—"failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family."

K.S.A. 2017 Supp. 38-2269(b)(8)—"lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child."

K.S.A. 2017 Supp. 38-2269(c)(2)—"failure to maintain regular visitation, contact or communication with the child or with the custodian of the child."

K.S.A. 2017 Supp. 38-2269(c)(3)—"failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home."

Father contests each of these factors. We choose to address two of them below, although any one of the five could be sufficient to warrant termination.

First, Father argues that the finding regarding his use of intoxicating liquors or narcotics under K.S.A. 2017 Supp. 38-2269(b)(3) was made in error because he has addressed his substance abuse by completing counseling and providing a number of

8

negative drug test results. Father also argues that he acknowledged that drug use was inappropriate when parenting a child.

But the record shows that Father tested positive for drugs on more than one occasion, including testing positive for amphetamine and methamphetamine as late as January 3, 2018. Additionally, Father refused to take several drug tests when requested and waited more than six months after the initiation of this case to obtain his first drug assessment. Moreover, Father never explicitly acknowledged the dangers of using methamphetamine while parenting. In fact, Father testified that he thought the drug affected people differently, insinuating that some parents may be able to use methamphetamine while parenting. Accordingly, we find clear and convincing evidence. that Father was unfit under K.S.A. 2017 Supp. 38-2269(b)(3).

Second, Father argues that the district court's finding under K.S.A. 2017 Supp. 38-2269(b)(8) for "lack of effort on the part of the parent to adjust the parents' circumstances, conduct or conditions to meet the needs of the child" was erroneous because he had completed a number of reintegration tasks.

The record confirms that Father completed some of his tasks but failed to complete the majority of his case plan tasks. Somers testified that Father completed some reintegration tasks, including receiving a clinical assessment, going to out-patient drug abuse treatment, gaining employment, and providing DCF with a housing lease. Father also testified that he had completed an appropriate parenting class and was participating in therapy but did not provide the court with proof of either. But Father also failed to attend anger management classes or reenter drug abuse treatment after failing yet another hair follicle test after treatment. Somers testified that Mother and Father's refusal to admit to using drugs caused "a huge barrier . . . . We can't move forward unless they admit there is an issue, they need help." These children "'should not have to endure the inevitable to [their] great detriment and harm in order to give the [father] an opportunity to prove h[is]

9

suitability.'" *In re Price*, 7 Kan. App. 2d 477, 480, 644 P.2d 467 (1982) (quoting *In re East*, 32 Ohio Misc. 65, 69, 288 N.E.2d 343 [1972]). We find clear and convincing evidence supporting the district court's reliance on K.S.A. 2017 Supp. 38-2269(b)(8).

Next, Father argues that insufficient evidence showed his unfitness was unlikely to change in the foreseeable future. Father asserts that the trial court was primarily concerned with Mother's ability to change in the foreseeable future and was not concerned with Father's future behavior.

Clear and convincing evidence must support the district court's finding that the conduct or condition rendering Father unfit is unlikely to change in the foreseeable future. K.S.A. 2017 Supp. 38-2269(a). We examine the term "foreseeable future" from the perspective of a child. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Children and adults have different perceptions of time, and a child has the right to permanency within a time frame that is reasonable to them. 50 Kan. App. 2d at 1170. And a district court may look to a parent's past conduct as an indicator of future behavior. See *In re Price*, 7 Kan. App. 2d at 483; *In re M.T.S.*, No. 112,776, 2015 WL 2343435, at *8 (Kan. App. 2015) (unpublished opinion).

P.W. and C.W. are now eight years old and five years old. By the date of the termination hearing, the children had been in DCF custody for 14 months. Father admitted that he had waited six months before even beginning his reintegration tasks. While these time frames may appear insignificant to Father, they are a significant amount of time to P.W. and C.W. Moreover, Father tested positive for methamphetamine and amphetamines throughout the proceedings of this case. Father also admitted to using methamphetamine and marijuana as late as January 3, 2018—almost 14 months into these proceedings. And it was both Mother *and* Father's drug use that caused a safety issue which inhibited DCF from checking the parents' home for the suitability of their living conditions. Moreover, and as noted by the district court, police had been called to

10

the home on several occasions for domestic violence issues. While Father denied ever becoming violent with Mother, she still feared going home to Father. And the district court found Father's denial of the domestic violence allegations not credible. Because Father has still not attended anger management classes or similar therapy, his past behavior has not been addressed. Failure to address these issues indicates a likelihood of repeating them.

The record refutes Father's perception that the district court was concerned only with Mother's behavior. The district court specifically applied its holding to Father as well as Mother. As such, we find no error in the district court's finding that Father is unfit and unlikely to change in the foreseeable future.

Finally, Father argues that insufficient evidence supports the district court's finding that termination was in the children's best interests. In making this argument, Father asserts that he will likely have continued contact with the children because they are placed with Mother's brother and his wife, J.G. Thus, Father argues that additional time to finish his reintegration tasks will have "far less of an impact on permanency than it might under other circumstances."

But Father ignores the fact that he has not seen P.W. since she was placed with J.G. and her husband and that he has not demonstrated a willingness to complete any of the three reintegration plans he was provided. Also, J.G. testified that P.W. was struggling emotionally due to Mother and Father's behavior. The district court considered J.G.'s testimony and found that P.W.'s refusal to see or speak with her parents was likely caused by Mother and Father's false promises, bribes, and unwillingness to make changes as necessary to visit the children. A reasonable person could have found the same and concluded that termination was in the best interests of the children. As such, we find no abuse of discretion in the district court's finding that termination was in the children's best interests.

11

Affirmed.